# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| DENNIS PRINDABLE, | ) |
| --- | --- |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 16-cv-01363-JPG-CJP ) |
| NANCY A. BERRYHILL, Acting Commissioner of Social Security, | ) ) ) ) |
| Defendant.[1] | ) |

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Dennis Prindable seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff applied for DIB on April 1, 2013, alleging an onset date of April 15, 2011. (Tr. 160-63.) His claim was initially denied on July 23, 2013, and again upon reconsideration on February 13, 2014. (Tr. 70, 81.) Plaintiff requested a hearing, which Administrative Law Judge (ALJ) Stuart Janney conducted on July 14, 2015. (Tr. 104-05, 30-69.) ALJ Janney issued an unfavorable decision following the hearing. (Tr. 13-24.) The Appeals Council denied review, making the ALJ's decision the final agency decision. (Tr. 1-7.) Plaintiff exhausted all of his administrative remedies and filed a timely complaint with this Court. (Doc. 1.)

## Applicable Legal Standards

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. *See* FED. R. CIV. P. 25(d); 42 U.S.C. §405(g).

1

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

> experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). See also, *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) ([u]nder the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that the Commissioner made no mistakes of law. This scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. §405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence: "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of

credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). While judicial review is deferential, however, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Janney followed the five-step analytical framework set forth above. He determined that plaintiff met the insured status requirements through December 31, 2016, and had not engaged in substantial gainful activity since the alleged onset date. Plaintiff had severe impairments of thoracic and lumbar spondylosis; bilateral hip osteoarthritis status post left total hip arthroplasty; right shoulder impingement treated surgically; and left shoulder rotator cuff tear treated surgically. (Tr. 15.) ALJ Janney opined plaintiff had the RFC to perform light work, with several restrictions. (Tr. 19.) The ALJ concluded plaintiff was not disabled because he could perform past relevant work. (Tr. 23.)

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

In his disability report, plaintiff alleged bipolar disorder, depression, anxiety, chronic pain, a back injury, and a right rotator cuff injury limited his ability to work. (Tr. 200.) His highest grade of education was twelfth grade. (Tr. 201.)

As of June 2015, plaintiff was prescribed Lamictal, Cymbalta, Fentanyl, Vicodin, Temazepam, Omeprazole, Ambien, and Latuda. (Tr. 260.)

In his initial function report, plaintiff indicated his conditions limited his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, concentrate, follow instructions, and get along with others. (Tr. 180.) On a typical day, plaintiff got out of bed around 9:00 am to take care of his pets. This included letting his dogs out and feeding his horses. He then cleaned up and ate lunch in the afternoon. Plaintiff read, then had dinner around 6:00 pm, and showered and got dressed. He read or watched television until around 10:00 pm, when he went to bed. (Tr. 175.) His conditions prevented him from working, riding horses, and exercising. He also had difficulty falling and staying asleep due to pain. (Tr. 176.) He sat down to get dressed to avoid standing, and had trouble bending to put his socks and shoes on. He took quick showers to avoid standing and had difficulty bending to wash his legs and feet. Plaintiff also had trouble clipping his toenails. (Tr. 176.) Plaintiff performed light cleaning for about twenty minutes, every other day; did dishes, daily, for five minutes; did laundry, twice per week, for one and a half hours; and mowed his lawn, once a week, for forty-five minutes. (Tr. 177.) Plaintiff grocery shopped, weekly, and was able to pay his bills, count change, handle a savings account, and use a checkbook. His conditions required him to keep reminders to pay bills. (Tr. 178.) He listed reading as his only hobby, but stated he had to shift positions frequently when sitting to read. He also had difficulty recalling and retaining the information he read. (Tr. 179.) Plaintiff experienced anxiety and panic attacks when he was stressed. Changes in routine caused him stress. (Tr. 181.)

In a letter dated July 14, 2015, plaintiff's wife stated plaintiff experienced manic phases that "put[] him out for a total of 5 days," experienced daily anxiety, was socially inept, and had no motivation to do anything. He did not take care of himself and urinated on himself all day

5

and night, but refused to take a shower. Plaintiff further refused to shave and sometimes spent all day in bed, depressed. He refused to eat or talk when he was depressed. (Tr. 262.)

### 2. Evidentiary Hearing

ALJ Janney presided over an evidentiary hearing on July 14, 2015. (Tr. 30-69.) Plaintiff was represented by counsel. He was fifty-four years old at the time of the hearing. (Tr. 32-36.)

In 2005, plaintiff was injured after a horse reared and fell back on him. He broke his lower back and crushed his pelvis. Plaintiff received a hip replacement and wore diapers because he developed bladder issues following the accident. He alleged the condition was worsening but he was not currently seeking treatment for it. His family doctor advised him to wait for treatment until absolutely necessary. (Tr. 36-41.)

On a "good day," which occurred about once per month, plaintiff helped his wife feed the horses and was able to ride them on a trail for two hours. (Tr. 41-42.) Plaintiff underwent two rotator cuff repairs. He had forty percent usage of his left arm, but could not reach out in front of him. He experienced occasional loss of feeling from his left shoulder down to his hand. (Tr. 46-47.) He could lift about twenty pounds with his right arm, but nothing with his left. Plaintiff could lift twenty-five pounds with both arms. (Tr. 50.) Plaintiff also had a left hip replacement, which felt "a lot better" after rehab. His right hip also needed to be replaced. He could stand, sit, and walk for twenty to thirty minutes at a time. Plaintiff used a cane on bad days, which occurred around three times each week. On a bad day, his hip pain was so severe that he could not bend, stretch, or get down on his knees. He also had problems squatting, sitting in a chair, and standing. (Tr. 47-48.)

Plaintiff received epidural injections and therapy and took medications for pain. His medicine made him drowsy. He could stay awake for two hours before needing a nap. He was

up during the night because he had to change his diapers twice throughout the night. Plaintiff used five diapers in twenty-four hours. He used the restrooms once an hour. (Tr. 48-49.)

Plaintiff experienced pain that he rated a seven out of ten, on a bad day. On a good day, his pain was a five. (Tr. 49.) He had arthritis in his pelvis and lower back. Plaintiff underwent surgery on his right ankle, and it stiffened up, which limited him to twenty to thirty minutes of walking each day. (Tr. 51.)

Plaintiff treated with a psychiatrist for bipolar disorder and anxiety. During a manic bipolar episode, he became aggressive, angry, and destroyed his house. The episodes occurred eight times each year and lasted for about three days, followed by a day of resting in bed. After the horse accident, plaintiff did not get along with people. He once threw a man through a glass door at work. (Tr. 52.)

Plaintiff's anxiety made him nervous around other people, and he experienced anxiety attacks daily. Plaintiff also had depression, which caused him to sleep for twelve hours a day, with two additional naps. Sometimes he stayed in bed for days. He did not have motivation to shower, even though he urinated on himself all day. He showered about once every three days, changed his shirt daily, and changed his shorts every couple of days. (Tr. 53-55.)

Plaintiff sometimes did dishes, fed his dogs, and cut his grass on a riding lawn mower. Other than that, he watched television. Plaintiff only ate tuna fish on bread. When he grocery-shopped with his wife, he usually had panic attacks from being around people. Plaintiff had difficulty remembering things. His conditions affected his memory, concentration, and attention. (Tr. 56-58.)

Plaintiff fractured a rib after a horse kicked him. He stopped attending physical therapy because his hip was feeling better and he only had one or two visits left. Plaintiff wanted to prolong undergoing a right hip replacement until the pain was unbearable. (Tr. 59-61.)

A vocational expert (VE) then testified that an individual with the ultimate RFC determination would be able to perform plaintiff's past work as a production supervisor in the machine operation and in the office. (Tr. 64.)

### 3. Medical Records

In March 2012, plaintiff presented to Dr. Adam Vargo at Primary Care Group with complaints of right shoulder pain and decreased range of motion (ROM). His symptoms began five days prior and resulted from "throwing." Dr. Vargo assessed plaintiff with a rotator cuff sprain and a biceps tendon rupture, and he administered an injection in plaintiff's glenohumeral joint space. A past surgical history of a severed urethra was also noted. (Tr. 309-10.) An MRI of plaintiff's right shoulder later that month revealed mild changes of tendons involving the supraspinatus tendon associated with tiny partial thickness intra-substance tear, and mild osteoarthritis. (Tr. 332-33.)

In April 2012, plaintiff told Dr. Vargo he was experiencing anxiety, excessive worrying, insomnia, irritability, nervousness, and sleep disruption. These symptoms began three months prior. Dr. Vargo assessed plaintiff with bipolar disorder and started him on Lamictal. Dr. Vargo noted plaintiff was prescribed Lortab for pain. (Tr. 306-07.)

In August 2012, plaintiff continued to report right shoulder pain to Dr. Vargo. Plaintiff received another injection and Dr. Vargo referred him to physical therapy. (Tr. 303-04.)

Plaintiff attended physical therapy at Primary Care Group from September 2012 through November 2012. (Tr. 295-302.) At his initial evaluation, plaintiff stated he injured his right

8

shoulder while lifting hay for his horses "the first part of [that] year." He did not seek medical attention for about three months. Although he was not currently working, plaintiff had multiple rental properties he had to maintain. He continued to be independent with self-care and work tasks, but required more time for tasks and experienced symptoms. The therapist noted that plaintiff's right bicep appeared to be detached with "popeye" appearance. He was tender to palpation over the insertion of the supraspinatus and indicative tests suggested impingement. His active range of motion (AROM) of the right shoulder was within functional limitations but tender at the end ranges. Manual muscle testing of the right shoulder and peri-scapular muscles indicated weakness. His right elbow AROM was also within functional limitations, but there was tenderness with full extension. Manual muscle testing of the elbow was good, but pain was elicited with resisted flexion. The therapist assessed plaintiff with pain and weakness in the right shoulder and elbow, which affected his completion of daily tasks. (Tr. 301-02.) At plaintiff's last documented session in this period, the therapist noted plaintiff was able to tolerate progression of his therapy program with a notable decrease in pain. (Tr. 295.)

In December 2012, plaintiff attended a consultation with Dr. Roland Barr at the Orthopedic Institute of Southern Illinois. He reported that physical therapy did not improve his shoulder pain. Dr. Barr assessed plaintiff with right shoulder pain with impingement syndrome and a probable small rotator cuff tear. Dr. Barr discussed the option of pursuing a shoulder arthroscopy. (Tr. 323-24.)

Imaging of plaintiff's left ribs from January 2013 revealed thoracic and lumbar spondylosis. (Tr. 322.)

Plaintiff underwent right shoulder decompression surgery in January 2013, and began attending physical therapy immediately thereafter. During his initial evaluation, plaintiff

9

complained of moderate pain. He told his therapist he worked on a farm and had to lift hay and feed horses. He demonstrated a passive range of motion (PROM) of thirty on his left shoulder, and 160 on his right. His elbow PROM was within functional limits on the left, and within normal limits on the right. Plaintiff's muscle strength was 4/5 on the left shoulder, 4/5 on the left elbow, and 4/5 on the left wrist. His right wrist was 3/5. (Tr. 266.)

In February 2013, plaintiff presented to Dr. Barr for a follow-up appointment for his right shoulder. He stated he was doing very well, but still had some pain and was using a sling. He had 130 degrees of forward elevation, passively. There was no pain with general internal and external rotation and he was neurovascularly intact. Dr. Barr planned to see him in four weeks. (Tr. 320.)

In March 2013, plaintiff's physical therapist stated he was able to perform his therapy exercises without difficulty. (Tr. 275.) Plaintiff presented to Dr. Barr and stated he was doing well and experiencing minimal pain. Plaintiff reported he was progressing extremely well with physical therapy. On exam, he had full PROM of the shoulder and active ROM except for internal rotation to about T12. He had no tenderness about the shoulder and was neurovascularly intact. Dr. Barr planned to see plaintiff in six weeks and continued plaintiff's physical therapy. (Tr. 318.)

Plaintiff also presented to Dr. David O'Neill in March 2013 with chief complaints of low back and hip pain. (Tr. 357-58.) X-rays of his left hip revealed moderate left hip degenerative changes, deep acetabular cup and prominent bump of the femoral neck, and chronic fracture deformities of the anterior pelvis. (Tr. 353-54.) X-rays of his right hip showed mild right hip degenerative changes and chronic fracture deformities of the anterior pelvis. (Tr. 355-56.) Dr. O'Neill noted plaintiff was taking Vicodin. (Tr. 358.)

In April 2013, an MRI of plaintiff's left hip revealed chronic fracture deformities of the left anterior pelvis; dysplastic and moderately degenerative left hip; multiple labral tears; deep acetabular cup; large apron osteophytes of the femoral neck; iliopsoas bursal effusion; small intramuscular ganglia of the left iliacus and psoas; and hamstrings tendinosis with a small partial tear at the insertion. (Tr. 346-47.) An MRI of plaintiff's right hip revealed moderately degenerative and mildly dyspastic right hip; multiple labral tears; deep acetabular cup chronic fracture deformities of the pubic rami; fluid collection; and severe atrophy or prior resection of the right rectus abdominus. (Tr. 348-49.) During physical therapy, plaintiff reported that his right arm did not have enough strength. His AROM was within normal limits and his right shoulder deltoid strength was a 3/5. The therapist noted prominent popeyes in plaintiff's right biceps. His pain was a 0-2/10. Plaintiff was progressing well and the therapist stated, "frequent use of [righter upper extremity] for [shoulder] level task." (Tr. 276.)

In August 2013, plaintiff presented to Dr. Sallie Schramm at Southern IL Psychiatry LLC for a new patient assessment. Plaintiff reported recurrent mood and anxiety symptoms, which dated back eight years. His medications included Fentanyl and Vicoden. Dr. Schramm assessed plaintiff with major depressive disorder; bipolar disorder, rule out post-traumatic stress disorder; and opiate dependence. Dr. Schramm noted she would observe him for personality disorder. She advised plaintiff to follow-up in one week. (Tr. 374-79.)

In September 2013, plaintiff presented to Dr. Barr with complaints of chronic bilateral hip pain, which was present ever since a horseback riding accident eight years prior. Plaintiff was on a walker and stated that sitting or standing for too long, lifting, and bending aggravated his pain. Plaintiff took pain pills and ibuprofen and had a pain patch. Dr. Barr assessed plaintiff with posttraumatic osteoarthritis of the bilateral hips, with significant disease. He noted plaintiff

had some history of back injury and mild low back pain. Dr. Barr recommended cortisone injections and reported that plaintiff "may well be a candidate for total hip arthroplasty in the near future," but suggested plaintiff put off surgery for as long as reasonably possible. (Tr. 342-43.) Plaintiff received bilateral fluoroscopically guided hip joint steroid injections. (Tr. 601-02.)

Plaintiff continued to receive psychiatric treatment with Dr. Schramm through September 2014. During his sessions, Dr. Schramm noted his cognition appeared to be grossly intact and he was able to stay focused. (Tr. 380-443.) In October 2013, plaintiff reported he was doing better and getting eight hours of sleep. (Tr. 384-87.) In November 2013, plaintiff stated he experienced some improvement in his mood symptoms, but had worsening physical pain. He was getting about eight hours of sleep. (Tr. 418-20.) In January 2013, plaintiff had a lot of complaints of physical pain and some agitation. (Tr. 421-24.) In February and September 2014, he reported some improvement and was getting eight hours of sleep. (Tr. 435-37.)

In June 2014, plaintiff complained of left shoulder pain to Dr. Barr. He stated he had been struggling with his left shoulder for at least seven months and had not been able to lift his arm for about five months. Dr. Barr diagnosed plaintiff with a left shoulder rotator cuff tear and recommended an MRI to confirm the diagnosis. (Tr. 592.) The MRI showed a large full thickness rotator cuff tear with some retraction. On exam, plaintiff had about twenty-five to thirty degrees forward flexion, forty-five degrees external rotations (ER), internal rotation (IR) to T12, and full PROM. He was tender at the greater tuberosity and had positive impingement. He had 4/5 strength with abduction, 3/5 with ER, and was neurovascularly intact. Dr. Barr suggested a left shoulder arthroscopy with open rotator cuff repair, and plaintiff wished to proceed with the surgery. (Tr. 588.)

Dr. Barr performed the left shoulder arthroscopy on July 24, 2014. (Tr. 585-86.) Plaintiff attended a follow-up appointment with Dr. Barr in October 2014 and reported he felt like he was progressing, but had limited ROM of his shoulder. On examination, his shoulder had 40 degrees of forward flexion and no pain with gentle internal/external rotation. He had excellent internal rotation. Plaintiff also had full PROM and no tenderness to palpation. Plaintiff's left hip was stiff and painful with rotation. He had no internal rotation but good flexion and abduction. He was neurovasculalry intact. Dr. Barr scheduled a total hip arthroplasty and noted that plaintiff would continue with his rotator cuff strengthening exercises. (Tr. 582.)

In November 2014, plaintiff presented to Dr. Barr for another follow-up appointment regarding his left rotator cuff repair surgery. Plaintiff stated he had no pain but did have weakness, although he felt he was improving. His PROM was "essentially full." His AROM was not even up to ninety degrees of abduction or forward flexion. He had normal active external rotation with no resistance as well as internal rotation to above the belt line. Dr. Barr planned for plaintiff to continue his rotator cuff strengthening. Dr. Barr noted that plaintiff told him he had a previous pelvic fracture and a urethral stricture, which required catheterization. (Tr. 579.)

Dr. Barr performed a left hip arthroplasty on plaintiff in November 2014. (Tr. 565-67.) He attended a follow-up appointment on December 11, 2014. He ambulated without any walking aides, was "doing great" with minimal pain, and had no new complaints or problems. On physical examination he had a minimal limp but no pain with rotation of his hip. He had good flexion and abduction and was neurovascularly intact. Dr. Barr continued plaintiff's

Coumadin and Norco and planned to see plaintiff in two months. He noted plaintiff would also continue with his strengthening exercises. (Tr. 570.)

## Analysis

Plaintiff first contends the ALJ did not properly evaluate his complaints of pain. ALJ Janney found plaintiff's impairments could reasonably cause his alleged symptoms, but opined plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely credible. (Tr. 20.)

A credibility determination receives "considerable deference" and a reviewing court will defer to the determination unless it is "patently wrong." *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). Here, the ALJ opined the objective evidence did not support plaintiff's allegations that he required a cane three times each week, could only sit for up to twenty minutes at a time, and had forty percent use of his left arm for reaching out and overhead. (Tr. 20.) In reaching this conclusion, ALJ Janney acknowledged plaintiff's thoracic and lumbar spondylosis, but stated there was no evidence of disc herniation, a recommendation for spinal surgery, or nerve root compression. (Tr. 20.) Plaintiff contends it was error for the ALJ to draw this negative inference.

An ALJ is required to weigh medical evidence and resolve any conflicts in the record. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). On review, the Court does not reweigh the evidence or substitute the ALJ's judgment for its own. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). An ALJ must not, however, "play doctor" and independently draw medical conclusions from the evidence. *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

ALJ Janney reasoned plaintiff was exaggerating his back pain because he was never diagnosed with nerve root compression or spinal stenosis. No medical source, however, offered

this opinion.  Dr. Barr noted the lack of disc herniation and spinal stenosis in a report from 2013, but he never indicated this contradicted plaintiff's complaints of pain.  (*See* Tr. 342-43.)  The ALJ's inference is, therefore, not supported by medical evidence and it amounts to the ALJ improperly "playing doctor."  Accordingly, it is not sufficient evidence to support the unfavorable credibility determination.  *See Hill v. Colvin*, 807 F.3d 862, 868 (7th Cir. 2015).

Plaintiff also points out that the ALJ wholly failed to address plaintiff's pain medications and their side effects, as well as his epidural injections.  20 C.F.R. § 404.1529 sets forth several factors an ALJ will consider when assessing a claimant's allegations of pain, including the nature and intensity of pain, precipitation and aggravating factors, dosage and effectiveness of pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  The Seventh Circuit has held that an "ALJ is not required to make specific findings concerning the side effects of prescription drugs on the claimant's ability to work."  *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994).  There must be some indication, however, that the ALJ actually considered the claimant's medications.  *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) ("[T]he ALJ *must* consider the claimant's level of pain, medication, treatment, daily activities, and limitations. . . .") (emphasis added).

Here, ALJ Janney did not make a single reference to plaintiff's pain medications in his opinion.  This omission was significant because plaintiff testified his medications made him drowsy, which required him to take naps every two hours.  The ALJ similarly omitted any discussion of plaintiff's epidural injections, which is also contrary to the Regulations.  20 C.F.R. § 404.1529 ("Factors relevant to your symptoms, such as pain, which we will consider include . . . [t]reatment, other than medication, you receive or have received for relief of your pain . . .").

Plaintiff also argues the ALJ improperly assessed his ADLs, a point to which the Commissioner concedes. The Commissioner argues, though, that this flaw does not render the ALJ's analysis erroneous.

While an agency's decision is subject to harmless error review, the Court must be able to predict "with great confidence that the agency will reinstate its decision on remand". *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Given the totality of the ALJ's errors, the Court cannot say with "great confidence" that the ALJ would have nonetheless reached the same conclusion. Accordingly, the ALJ's decision must be remanded. *See Stark v. Colvin*, 813 F.3d 684, 687 (7th Cir. 2016) (ALJ's failure to mention evidence that buttressed the claimant's testimony such as pain medications and epidural injections required remand). Since remand is warranted on plaintiff's first argument, the remaining ones will not be addressed.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATED:  October 26, 2017**

> **s/ *J. Phil Gilbert***
> **J. PHIL GILBERT**
> **DISTRICT JUDGE**